IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ROBERT EARL JOHNSON | § | |
| TDCJ-CID #538275 | § | |
| v. | § | C.A. NO. C-09-313 |
| | § | |
| RICK THALER, ET AL. | § | |

**OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is a state prisoner civil rights action filed pursuant to 42 U.S.C. § 1983.  Pending is

Defendants' motion for summary judgment.  (D.E. 59).  For the reasons stated herein,

Defendants' motion is hereby GRANTED.

**I.  JURISDICTION**

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

After consent by the parties, (D.E. 15, 57), the case was referred to a magistrate judge to conduct

all further proceedings, including entry of final judgment.  (D.E. 16); see also 28 U.S.C.

§ 636(c).

**II.  PROCEDURAL HISTORY**

On November 12, 2009, Plaintiff filed this action raising civil rights claims against

Texas Department of Criminal Justice, Correctional Institutions Division ("TDCJ-CID")

Executive Director Rick Thaler;[1] (2) Warden Ernest Gutierrez; (3) Warden Richard Crites; (4)

Officer Enrique Sanchez; and (5) Officer John Doe.  (D.E. 1).  Following a December 2, 2009

---

[1] In his original complaint, Plaintiff named former TDCJ-CID Director Nathaniel Quarterman as a defendant.  (D.E. 1).  Mr. Quarterman retired on July 15, 2009, and therefore the new director, Rick Thaler, was substituted in his place based on Plaintiff's oral motion during a December 2, 2009 telephone hearing.

Spears[2] hearing, an Order was entered to dismiss certain claims and retain the case on December 24, 2009.  (D.E. 17).  Specifically, the claims against Defendants Thaler and Gutierrez were dismissed for failure to state a claim because they were not personally involved in the actions or omissions that led to Plaintiff's injuries, and because Plaintiff alleged no unconstitutional policy. Plaintiff's claims for failure to protect and negligence against Defendants Crites, Sanchez, and Doe were retained.  (D.E. 17).

On December 24, 2009, service was ordered on Warden Crites as well as Officers Sanchez and Doe.  (D.E. 18).  Warden Crites filed an answer on February 8, 2010.  (D.E. 28).  It was determined that Officer Aaron Fuentes was the John Doe defendant and he subsequently filed an answer on February 23, 2010.  (D.E. 34).  On June 23, 2010, Defendants Crites and Fuentes filed their motion for summary judgment.  (D.E. 59).  The Court dismissed Plaintiff's claim against Defendant Sanchez on July 8, 2010, because he could not be located and because Plaintiff had made no efforts to obtain a viable address for him to be served.  (D.E. 62).

### III.  PLAINTIFF'S ALLEGATIONS

Plaintiff claims that Defendants are responsible for an assault he suffered that was committed by his cell-mate.  (D.E. 1).  Specifically, he alleges that Warden Crites was deliberately indifferent to his safety because he failed to segregate prisoners like Plaintiff who were at risk from more dangerous offenders.  (D.E. 1, at 6).  He claims further that Warden Crites denied him an earlier Offender Protection Investigation which contributed to the assault in October 2009.  Id.

Additionally, Plaintiff asserts that Officer Fuentes was deliberately indifferent to his

---

[2] Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985); see also Eason v. Holt, 73 F.3d 600, 603 (5th Cir. 1996) (testimony given at a Spears hearing is incorporated into the pleadings).

safety when he allowed Plaintiff to enter his cell without an officer on duty at the pod as required by TDCJ-CID regulations.  Id. at 8.  He also alleges that Defendants failed to intervene promptly after the attack began, thus resulting in greater injuries to Plaintiff.  Id. at 12.

Finally, Plaintiff argues that Defendant Crites retaliated against him for earlier complaints by deliberately failing to conduct a thorough investigation of the incident, by depriving him of a number of rights during the disciplinary hearing that followed, and by punishing him unfairly for an altercation he was not responsible for causing.  Id. at 6, 13-14.

## IV.  SUMMARY JUDGMENT EVIDENCE

On September 9, 2009, Richard Brown was assigned to Plaintiff's cell at the McConnell Unit in Beeville, Texas.  Id. at 11.  He told Plaintiff that he was serving a life sentence for murder.  (D.E. 23, at 3).  He is, by Plaintiff's account, substantially younger and larger than Plaintiff, homosexual, and white.  (D.E. 1, at 10-11; D.E. 23, at 5).  Plaintiff had at the time served twenty years out of a sentence of twenty-five and was up for parole.  (D.E. 1, at 11).  He is fifty-one years old, four foot eleven inches tall, about 130 pounds, heterosexual, and black.  (D.E. 59, at Ex. A, at 5-6; D.E. 51, at Ex. A, at 13).  There were no problems between the cell-mates during their first month of living together.

On October 8, 2009, at approximately 4:00 a.m., Plaintiff left his cell and went to breakfast in the chow hall.  (D.E. 1, at 11).  On the way back to his cell around 4:30 a.m. he stopped at the pill window to receive his seizure medication.  (D.E. 51, at Ex. A, at 17).  As he was walking back to his cell, Plaintiff noticed that there was no officer on the pod.  (D.E. 59, at Ex. A, at 17).  Officer Sanchez was assigned to the pod that day but was, according to Plaintiff, absent from his post.  Id.  When Plaintiff arrived at his cell, Officer Fuentes, who was working

the picket, opened the door to let him enter.  Id.  As he entered, Brown jumped on him and began assaulting him.  (D.E. 1, at 12).  Brown punched him in the ribs and face, choked him, and verbally threatened his life.  Id.  In an effort to protect himself, Plaintiff bit Brown's thumb.  Id. at 11.  Brown then called out for help, alerting neighboring inmates and ultimately security guards to the altercation.  Id. at 11-12.  Sergeant Gaines arrived and stopped the fight.  He then escorted Plaintiff and Brown up to the front desk, placing Brown in the cage.  During a physical examination conducted shortly thereafter, it was determined that Brown had broken three of Plaintiff's bottom teeth and knocked one of his top teeth loose.  (D.E. 59, at Ex. A, at 20).  Plaintiff also suffered a black eye and a knot in his shoulder.  Prison authorities characterized his injuries as minor.  Id. at 19, 26.

An investigation was conducted into the altercation.  Plaintiff was placed in segregation and sanctioned with a reduction in class and a curtailment of commissary and recreation privileges.  (D.E. 1, at 14; D.E. 59, at Ex. A, at 24, 27).  Shortly after the incident, Plaintiff filed a Life in Danger claim against Brown.  (D.E. 1, at 6).[3]  On November 10, 2009, he was transferred to the Boyd Unit.  (D.E. 11).

## V.  DISCUSSION

Defendants Crites and Fuentes seek summary judgment and dismissal of Plaintiff's claims on the grounds that they are entitled to qualified immunity, that official immunity bars Plaintiff's negligence claim, and that Defendants were not negligent.  (D.E. 59).

---

[3] Plaintiff received a disciplinary case concerning the October 8, 2009 incident.  At the Spears hearing, Plaintiff complained that certain officers, including Defendant Crites, failed to conduct a proper investigation or review a videotape of the incident.  He was advised that any claims relating to the disciplinary hearing must be pursued in a habeas corpus petition.

4

**A.      The Standard Of Review For Summary Judgment Motions.**

Summary judgment is appropriate when there is no disputed issue of material fact, and one party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Courts must consider the record as a whole, including all pleadings, depositions, affidavits, interrogatories and admissions on file, in the light most favorable to the non-movant.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002) (citation omitted).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact and informing the court of the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which support its contention.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Williams v. Adams, 836 F.2d 958, 960 (5th Cir. 1988) (citation omitted).  Any controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

If the moving party makes the required showing, then the burden shifts to the non-movant to show that a genuine issue of material fact remains for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Fields v. City of S. Houston, 922 F.2d 1183, 1187 (5th Cir. 1991) (citation omitted).  The non-movant cannot merely rest on the allegations of the pleadings, but must establish that there are material controverted facts in order to preclude summary judgment.  Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986) (citation omitted).  Summary judgment is proper if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears

the burden of proof.  Celotex, 477 U.S. at 322-23; ContiCommodity Servs., Inc. v. Ragan, 63

F.3d 438, 441 (5th Cir. 1995) (citations omitted).  In reviewing failure to protect claims filed by

inmates against multiple defendants, the Fifth Circuit mandates that courts review each

individual defendant's actions, and not make blanket rulings on summary judgment motions.

Longoria v. Texas, 473 F.3d 586, 593 (5th Cir. 2006).

**B.      Defendants Are Entitled To Qualified Immunity.**

Defendants argue that qualified immunity protects them from this action.  (D.E. 59, at 3-

8).  They claim that Plaintiff's constitutional rights were not violated by Defendants because

they were not aware of any danger to Plaintiff and because they were not responsible for several

of the allegedly unconstitutional acts.  (D.E. 59, at 4-6).  Further, they assert that their actions

were objectively reasonable under the circumstances.  (D.E. 59, at 7-8).

The doctrine of qualified immunity affords protection against individual liability for civil

damages to officials "insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555

U.S. __, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to

demonstrate the inapplicability of the defense.  McClendon v. City of Columbia, 305 F.3d 314,

323 (5th Cir. 2002) (en banc) (per curiam) (citation omitted).  "To discharge this burden, a

plaintiff must satisfy a two-prong test."  Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 253 (5th

Cir. 2005).  "First, he must claim that the defendants committed a constitutional violation under

current law."  Id. (citations omitted).  "Second, he must claim that defendants' actions were

objectively unreasonable in light of the law that was clearly established at the time of the actions

6

complained of."  Id.  While it will often be appropriate to conduct the qualified immunity

analysis by first determining whether a constitutional violation occurred and then determining

whether the constitutional right was clearly established, that ordering of the analytical steps is no

longer mandatory.  Pearson, 555 U.S. at __, 129 S. Ct. at 818 (receding from Saucier v. Katz,

533 U.S. 194 (2001)).

### 1. Step 1 – constitutional violation.

The Supreme Court has announced that "prison officials have a duty ... to protect

prisoners from violence at the hands of other prisoners."  Farmer v. Brennan, 511 U.S. 825, 833

(1994) (citation omitted); accord Cantu v. Jones, 293 F.3d 839, 844 (5th Cir. 2002).  "It is not,

however, every injury suffered by one prisoner at the hands of another that translates into

constitutional liability for prison officials responsible for the victim's safety."  Farmer, 511 U.S.

at 834.  To succeed on a failure to protect claim, "'the inmate must show that he is incarcerated

under conditions posing a substantial risk of serious harm' and that the prison officials acted

with 'deliberate indifference' to the inmate's safety."  Johnson v. Johnson, 385 F.3d 503, 524

(5th Cir. 2004) (quoting Farmer, 511 U.S. at 834).  "An official is deliberately indifferent when

he 'knows of and disregards an excessive risk to inmate health or safety; the official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference.'"  Id. (quoting Farmer, 511 U.S. at 837).  "The

official's knowledge of the risk can be proven through circumstantial evidence, such as by

showing that the risk was so obvious that the official must have known about it."  Id. (citing

Farmer, 511 U.S. at 842).  Finally, "there is no liability if the official 'responded reasonably to

the risk, even if the harm ultimately was not averted.'"  Id. (quoting Farmer, 511 U.S. at 844).

None of Plaintiff's claims state constitutional violations and he therefore fails to discharge his burden on the first prong of the qualified immunity analysis.

### a.   The cell assignment.

Brown's assignment as Plaintiff's cell-mate does not represent a constitutional violation by Defendants.  First, prison inmates have no constitutionally protected interest in their classifications.  See Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) (citation omitted) (discussing reclassification for protective custody, safekeeping status, or unit transfer).  In suggesting that his small stature warranted a special status for purposes of housing, Plaintiff here appears to challenge Defendant Crites' failure to classify him for protective custody or safekeeping status.  (D.E. 1, at 6).  That claim is barred by Neals.  59 F.3d at 533 ("an inmate's disagreement with a classification is insufficient to establish a constitutional violation").

Second, Defendants insist that they had no part in the decision to house the two offenders together and have documentation supporting that claim.  (D.E. 59, at 5 & Ex. A, at 3).  Plaintiff has not pointed to anything that would indicate otherwise.  Personal involvement in an alleged constitutional deprivation is an essential element of a civil rights cause of action.  Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983) (citing Rizzo v. Goode, 423 U.S. 362, 371-72 (1976)).  To state a § 1983 claim, a plaintiff must enunciate a set of facts that illustrates each defendant's participation in the alleged constitutional deprivation.  Jacquez v. Procunier, 801 F.2d 789, 793 (5th Cir. 1986).  Plaintiff fails to establish personal involvement in the cell assignment.

In the absence of personal involvement, Plaintiff seems to allege that Defendant Crites is liable as a supervisory official for the cell-assignment decision.  (D.E. 1, at 6).  Such a theory of liability requires "a causal connection between an act of the [supervisor] and the constitutional

violation sought to be redressed." Harvey v. Andrist, 754 F.2d 569, 572 (5th Cir. 1985) (citations omitted); see also Hinshaw v. Doffer, 785 F.2d 1260, 1263 (5th Cir. 1986) (usually a failure to supervise imposes § 1983 liability only where there is a history of widespread deprivations) (citation omitted).  The implementation of an arbitrary or insufficiently scrupulous cell-assignment system can, under certain circumstances, constitute a violation of the Eighth Amendment by prison officials.  See Walsh v. Mellas, 837 F.2d 789, 797-99 (7th Cir. 1988).  Defendant Crites does not deny that he played a role in formulating the cell-assignment policy at the McConnell Unit, and his position of authority suggests that he had some influence in the matter.  There is thus a fact issue whether he can be held liable pursuant to § 1983 for that policy.

Nevertheless, the decision to designate Plaintiff and Brown as cell-mates was itself not a constitutional deprivation, because the facts simply did not support an inference that Plaintiff faced a substantial risk.  He emphasizes the differences in race, age, length of sentence (or time until release), disciplinary history, sexual orientation, and size between him and Brown in arguing that prison officials ought to have been aware of their incompatibility.  (D.E. 1, at 11-14).  None of these differences, separately or jointly, establish that Plaintiff's cell assignment exposed him to an excessive risk to his safety.

Prison officials cannot be faulted for refusing to segregate prisoners on the basis of race, as that policy would subject them to potential liability on other constitutional grounds.  See Johnson v. California, 543 U.S. 499, 509 (2005) (mandating strict scrutiny review under Equal Protection Clause for racial segregation in prison).  Age can be a legitimate factor in analyzing cell-assignment regimes under deliberate indifference claims.  See Jensen v. Clarke, 94 F.3d

1191, 1199 (8th Cir. 1996) (citation omitted).  But the difference in ages between Plaintiff and his assailant did not make the offenders obviously incompatible.  Plaintiff is fifty-one and Brown is thirty-seven, a significant but not overtly dangerous disparity.  Texas Department of Criminal Justice, Offender Information Detail, www.tdcj.state.tx.us (last visited August 27, 2010).

Length of sentence is likewise a valid concern in making out a failure to protect claim within the context of prison cell assignments.  See Jensen, 94 F.3d at 1199 (citation omitted).  However, the severity of the cell-mates' offenses were not wildly different, as Plaintiff's sentence of twenty-five years suggests the commission of a relatively grave crime, and Brown was not, as he allegedly told Plaintiff, imprisoned for murder.  Texas Department of Criminal Justice, Offender Information Detail, www.tdcj.state.tx.us (last visited August 27, 2010).  Moreover, Plaintiff opines that his incompatibility with Brown was less a matter of prison sentences than a matter of proximity to release.  He believes that his imminent parole, in conjunction with Brown's recently increased sentence, provoked the latter into attacking him.  (D.E. 23, at 21).  He therefore appears to suggest that prison officials be required to re-assign cell-mates whenever their fortunes in the penal system diverge, a proposition lacking in legal support or administrative reasonableness.

Housing an inmate who has a long and checkered prison disciplinary record with an offender who does not can raise deliberate indifference concerns.  See Hinojosa v. Johnson, 277 F. App'x 370, 376-77 (5th Cir. 2008) (per curiam) (unpublished).  However, Plaintiff's argument that Brown's history of disciplinary infractions should have prevented the housing determination made in his case is inadequately supported by the record to survive summary judgment.  He fails to point to any evidence in the record suggesting that Brown has such a history, relying instead

on unsupported hearsay from anonymous inmates.  (D.E. 51, at Ex. E, at 19).  His own

disciplinary history is far from spotless, suggesting that even if Brown did have a track record it

would not necessarily make the two incompatible.  Id. at 13.  Plaintiff is therefore resting on the

bare allegations of the pleadings and has not established any material controverted facts.  Fed. R.

Civ. P. 56(e); Liberty Lobby, 477 U.S. at 248-49 (citation omitted).

In addition, even if Brown did have a record of infractions, it would take more specific

evidence of a threat to Plaintiff for the housing decision to constitute deliberate indifference.  See

generally Hinojosa, 277 F. App'x at 376-77 (finding a "history of violence" and several

disciplinary infractions by inmate assailant "insufficient to create a genuine issue of material fact

regarding the seriousness of the threat").  No such specific evidence can be found in the record.

Indeed, Plaintiff concedes that no disputes had arisen between him and Brown prior to October

8, 2009, and that he never registered any discontent with his cell-mate with the prison authorities

before their altercation.  Defendants therefore had no reason to suspect that Brown posed a risk

to Plaintiff.

Plaintiff counts Brown's purported homosexuality as another reason prison authorities

ought not to have housed the two offenders together.  (D.E. 1, at 11).  Sexual orientation can be

an appropriate factor to consult in a failure to protect claim challenging a prison housing

decision.  See generally Johnson, 385 F.3d at 530-33 (reversing dismissal for failure to state a

claim where a homosexual plaintiff alleged Equal Protection violation for being denied protected

housing status).  In Johnson, though, the plaintiff was repeatedly raped.  Id. at 512.  Plaintiff here

does not claim that Brown sexually assaulted him.  Nor does he assert that a fear or hatred of

homosexuality (or heterosexuality) inspired the violent episode.  See Croom v. Wagner, No. 06-

1431, 2006 WL 2619794, at *6 (E.D. Pa. Sept. 11, 2006) (unpublished) (noting that hatred of, or history of violence towards, sexual orientation can be a valid factor in a failure to protect challenge to prison housing designation).  Instead, he claims that Brown attacked him simply because he wanted to be re-assigned to live with another homosexual inmate.  (D.E. 1, at 11).  Plaintiff's argument, taken to its logical conclusion, would have prisons segregate inmates on the basis of sexual orientation solely in order to avoid assaults aimed at forcing prison authorities to satisfy inmates' housing preferences.  Plaintiff offers no support for this position nor does there appear to be any such case law.  Indeed, there is no compelling reason not to carry the argument further and maintain that <u>any</u> difference between cell-mates likely to lead to dissatisfaction on the part of an inmate is a violation of the Eighth Amendment, a manifestly unreasonable position.

A substantial difference in size between cell-mates is also a legitimate factor in a failure to protect inquiry into prison housing assignments.  <u>See</u> <u>Jensen</u>, 94 F.3d at 1199 (citation omitted).  Relying on Plaintiff's uncontested visual estimation, there was such a substantial difference between Plaintiff and Brown.  (D.E. 1, at 12).  Nevertheless, there are no cases, in the Fifth Circuit or elsewhere, finding a failure to protect solely because of a disparity in height and weight between cell-mates.  The difference in size alone is thus inadequate to support the inference of substantial danger.

Even if one accepts that the difference in size between the cell-mates put Plaintiff in harm's way, a claim of supervisory liability for prison housing determinations must attack the entire process by which inmates are assigned to share living space.  The challenged system must be so random as to disregard <u>several</u> potentially dangerous differences between cell-mates.

12

<u>Jensen</u>, 94 F.3d at 1199.  In addition, to support such a claim a plaintiff must put forth evidence of pervasive injuries throughout the challenged system.  <u>Id.</u> at 1198.  Because the difference in size between Plaintiff and Brown was the only potential valid and relevant factor cited by Plaintiff, and because he has shown no indication of pervasive injuries, his challenge to his cell assignment fails to establish supervisory liability.

Finally, even if one accepts the contention that the qualities of Brown described above lead to an inference of substantial risk of serious harm, there is no evidence in the record to indicate that Defendants were aware of that risk.  Indeed, Plaintiff's testimony at his <u>Spears</u> hearing demonstrates that even <u>he</u> does not really believe that Defendants were aware of any danger in the cell assignment.  For he blames Defendants not for ignoring any risks in placing the two men together, but for moving Brown into his cell without any reason.  Of course, the burden is not on Defendants to justify the housing decision, but rather on Plaintiff to show its dangerousness.  There is thus no reason to suppose that the Defendants did in fact draw an inference of danger.  Nor can it be plausibly maintained that the risk was so obvious that Defendants must have known about it.

Plaintiff's challenge to his cell assignment thus fails to state a constitutional violation.

**b.    Denial of the earlier Offender Protection Investigation.**

There is likewise no constitutional violation stated in Plaintiff's allegation that Defendant Crites denied Plaintiff an earlier Offender Protection Investigation and thereby contributed to his October 8, 2009 assault.  (D.E. 1, at 6).  The only earlier Offender Protection Investigation in the record appears to have been filed after an assault on Plaintiff approximately six months before his altercation with Brown.  (D.E. 59, at Ex. A, at 32-36).  Prison authorities substantially agreed

with Plaintiff's complaint and transferred him to another unit.  Id. at 34.  There is thus no

evidence that the earlier Offender Protection Investigation played a role in the events of October

8.  Furthermore, Plaintiff admits that he filed no complaints about his cell-mate until after the

October 8 incident, and that he had experienced no problems with Brown until that date.  It is

difficult to imagine how any Offender Protection Investigation would have alerted Defendant

Crites to a substantial risk to Plaintiff.  Finally, even assuming that earlier grievance reports

should have brought Plaintiff's vulnerability to Defendant Crites' attention, an inadequate

investigation constitutes negligence at the most, not a civil rights violation pursuant to § 1983.

Neals, 59 F.3d at 533.

### c.    Failure to intervene promptly.

Plaintiff also fails to state a valid constitutional claim in alleging that Defendants did not

intervene promptly to quell the altercation and thereby exacerbated his injuries.  Prison guards

"responded reasonably" once they became aware of the assault upon Plaintiff, "even if the harm

ultimately was not averted."  Johnson, 385 F.3d at 524 (citing Farmer, 511 U.S. at 844).  He has

not alleged how long the attack lasted, but his account does not suggest that it extended more

than a few minutes at the most.  According to Plaintiff, Brown punched him three times before

trying to choke him, and he then promptly bit Brown, sustaining the damage to his teeth and

causing Brown to call out for help.  (D.E. 59, at Ex. A, at 41).  There does not appear to be much

time during such a rapid episode for a fast response to have prevented the injuries.  Reports

completed by prison officials confirm that guards responded promptly to the altercation.  By 4:45

a.m., only fifteen minutes after the assault began, prison medical personnel had already

examined Brown and written up a report documenting his injuries.  Id. at 29.  Indeed, Plaintiff's

14

own narrative intimates that Defendant Fuentes acted to break the two men up as soon as he became aware of the disturbance.

Finally, Plaintiff's injuries were relatively minor, suggesting that he could not have been the victim of a prolonged attack if it was as violent, and if his assailant was as comparatively large, as he claims.  Id. at 19, 26.  His most serious wound, the damage to his teeth, was by his own account sustained in the first few seconds of the attack, indicating that no reasonable officer responding promptly could have prevented it.  Accordingly, Plaintiff's claim that Defendants failed to protect him by responding tardily to the scene does not state a constitutional violation. See generally Millsap v. Booker, No. 93-7249, 1994 WL 83759, at *2-3 (5th Cir. Feb. 28, 1994) (per curiam) (unpublished) (no failure to protect where guards responded as soon as possible to inmate stabbing that took no more than a few minutes).

### d.      Allowing Plaintiff into his cell without a guard at the pod present.

Viewing the record as a whole in the light most favorable to Plaintiff, his claim that Defendant Fuentes failed to protect him by letting him into his cell without a guard on the pod does not state a constitutional claim.  Plaintiff presents no evidence that the guard was in fact absent, and a review by prison officials determined that he was at his post.  (D.E. 23, at 19). Nevertheless, accepting Plaintiff's recollection, his claim still fails.

First,  Defendant Fuentes' actions were one step removed from the party most directly responsible for the alleged violation: the absent guard himself.  See Millsap, 1994 WL 83759, at *2 (suggesting that injuries stemming from a vacant guard tower were chargeable to guards assigned to that post, not guards performing other duties).  Second, Plaintiff contradicts his own assertion that Defendant Fuentes was violating standard operating procedure in allowing Plaintiff

into the cell without a guard present when he attributes the absence of the guard to chronic understaffing.  If guards were absent frequently due to understaffing then Defendant Fuentes would not have been transgressing any custom or norm, but rather acting out of necessity in the face of understaffing over which he had no control.

Third, assuming that Defendant Fuentes had a duty to ascertain the presence of the guard, there is no apparent link between the guard's absence and the attack on Plaintiff or the injuries he suffered.  In a § 1983 action, there must be a causal connection between the alleged constitutional violation and the claimed injury.  Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402, 1415-16 (5th Cir. 1995) (noting that the proximate cause standard will often be higher in § 1983 actions than it is in regular tort law).  That proximate cause is missing in this action. Brown could very well have assaulted Plaintiff while a guard was present, especially considering the fact that the assault was broken up relatively quickly regardless, and the fact that Plaintiff's injuries were received within such a short period of time.  In addition, Plaintiff reports that Brown was the one who first alerted guards to the altercation.  (D.E. 1, at 11-12).  It is therefore illogical to assume that the presence of an officer in the pod would have prevented Plaintiff's injuries.  Indeed, given their close quarters, if Brown was as hostile to Plaintiff as he believes, it would seem inevitable that there would be a confrontation at some point in time.  There is no reason to think that the confrontation, whenever it occurred, would have been any less violent than it was on October 8, 2009.  As it has already been established that Defendant Fuentes had no reason to suspect that Plaintiff's cell-mate posed a risk to his safety, he had no reason to exercise particular vigilance with respect to the cell.

Consequently, though Defendant Fuentes may have been remiss in failing to confirm the

presence of a guard on the pod, his actions do not rise to the level of "unnecessary and wanton infliction of pain" necessary for a finding of cruel and unusual punishment in a prison.  Whitley v. Albers, 475 U.S. 312, 327 (1986).  On the contrary, this mistake would at most represent "ordinary lack of due care for the prisoner's interests or safety," which does not rise to the level of a constitutional violation.  Id. at 319.

      **e.**      **Retaliation.**

Plaintiff claims that Defendant Crites retaliated against him for filing grievance reports by deliberately conducting an inadequate investigation into Brown's assault, by depriving him of a number of rights during the disciplinary hearings that followed the assault, and by sanctioning him unfairly for the October 8 attack.  (D.E. 1, at 6).  These allegations do not state a constitutional claim.

A prisoner's First Amendment right of access to the courts includes the right to seek redress through an established prison grievance system.  See Jackson v. Cain, 864 F.2d 1235, 1248-49 (5th Cir. 1989).  Prison officials may not retaliate against a prisoner for exercising this right.  Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995) (citations omitted).  Because it is well established that prison officials may not retaliate against a prisoner for exercising the right to file lawsuits and administrative grievances, actions that might not otherwise be offensive to the Constitution can give rise to a constitutional claim if taken in retaliation for the exercise of the protected conduct.  Id. at 1165 ("An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate.") (citations omitted).

To state a valid § 1983 claim for retaliation, "a prisoner must allege (1) a specific

constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999) (per curiam) (citing McDonald v. Steward, 132 F.3d 225, 231) (5th Cir. 1998)). An inmate must allege more than his "personal belief that he is the victim of retaliation." Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) (citation omitted). "Mere conclusory allegations of retaliation will not withstand a summary judgment challenge." Woods, 60 F.3d at 1166 (citation omitted). The Fifth Circuit has explained that an "inmate must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may be plausibly inferred.'" Id. (citations omitted).

The purpose of allowing retaliation claims pursuant to "§ 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights." Morris v. Powell, 449 F.3d 682, 686 (5th Cir. 2006) (citing Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)). However, some acts, even though they may be "motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights." Id. "Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim." Id. For example, a job transfer from the commissary to the kitchen might be de minimis, while a transfer to a more dangerous unit might constitute an adverse retaliatory act. Id. at 687.

There is no evidence in the record to suggest that Defendants wished to retaliate against Plaintiff for filing grievances. First, there is no reason to believe that his earlier grievance reports caused ill will amongst prison authorities. The only earlier prison incident involving Plaintiff that is described in the record took place roughly six months before the altercation with Brown. It appears to have resulted in a legitimate complaint by Plaintiff and to have been treated

as such by prison officials.  (D.E. 59, at Ex. A, at 32-36).

Second, one alleged retaliatory act–the shoddy investigation–does not present a civil rights violation under § 1983.  Neals, 59 F.3d at 533.  Nor does it appear that such an investigation took place.  Prison documents indicate that a number of different officials followed up on the incident between Plaintiff and Brown, conducting interviews with them, ascertaining the injuries sustained by the two men, making determinations about what happened, and issuing recommendations and orders on disciplinary actions to take in response.  (D.E. 51, at Ex. A, at 2-11, 20-21).  Taken as a whole, this series of reports documents a thorough investigation with proper oversight.

Third, there is no evidence to support the contention that the disciplinary actions taken against Plaintiff arose from a retaliatory motive.  If his version of events is accurate, he may understandably feel that he was not treated fairly when sanctioned for an altercation he had no role in causing.  Nevertheless, prison officials were well within their rights to weigh the two inmates' accounts as they saw fit, and the Court is not in a position to second guess that assessment.  It should also be noted in this regard that prison documents indicate that Plaintiff pled guilty to assault during the proceedings that followed the incident, an issue that he nowhere addresses.  (D.E. 51, at Ex. J, at 4).

There is also evidence suggesting that prison authorities ultimately were persuaded in substantial measure by Plaintiff's account of the altercation, as the grievance response form recommended that he be "transfer[red] due to ... being a victim of assault,"  (D.E. 22, at 3) (emphasis in original), and the recommendation was soon followed.  (D.E. 11).  Far from indicating retaliation, this strongly supports the notion that the disciplinary proceedings largely

credited Plaintiff's account.

Fourth, even if the investigation or hearings were ineffective or unfair, there is no evidence to suggest that Defendant Crites oversaw their operations or instructed the many individual officers involved to compromise their work. Thus, Plaintiff failed to establish the requisite personal involvement concerning this claim.

Fifth, the deprivations of due process rights in the disciplinary process that Plaintiff alleges evince no retaliatory motive and no but-for causation. His principal objections to his disciplinary process appear to be that he was not allowed to cross-examine witnesses, or review videotape footage of the incident. (D.E. 23, at 7). There is nothing in the record to bolster his assertion that these aspects of the proceedings, or any other, were affected by disgruntlement with earlier grievance reports. Similarly, there is no reason to suppose that Plaintiff would have received a different result had witnesses been made available to cross-examine or had the videotape been provided to him. The fact that Plaintiff was in the end acknowledged to be the victim of the episode suggests that the error did not stem from retaliatory designs. For the purpose of the deprivations, if motivated by retaliation, would have been to label Plaintiff the aggressor and punish him accordingly, not to label him the victim. Any challenge to his disciplinary punishment should be in a habeas petition.

For the reasons stated above, none of the acts or omissions of Defendants were constitutional violations and Plaintiff's complaint thus fails to survive the first prong of the qualified immunity inquiry.

### 2.        Step 2 – objective reasonableness.

In the context of an Eighth Amendment deliberate indifference claim, whether a defendant's actions are objectively reasonable depends on whether the defendant both knew of the risk and failed to take reasonable measures to alleviate it.  <u>Farmer</u>, 511 U.S. at 847.  The Fifth Circuit has explained that "the 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference."  <u>Domino v. Texas Dep't of Crim. Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001) (quoting <u>Farmer</u>, 511 U.S. at 838).  Moreover, "negligence is insufficient to support a finding of liability."  <u>Adames v. Perez</u>, 331 F.3d 508, 514 (5th Cir. 2003).  Prison officials violate the Eighth Amendment only if they are both aware of a substantial risk to inmate safety <u>and</u> fail to respond properly.  <u>Johnson</u>, 385 F.3d at 524.

When assessing objective reasonableness, it is necessary to articulate the asserted constitutional right more specifically.  <u>Thompson v. Upshur County, Tex.</u>, 245 F.3d 447, 460 (5th Cir. 2001).  Thus, "when the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have known that the alleged acts of the defendants violated the United States Constitution."  <u>Id.</u> (citation omitted).  For a right to be clearly established under the second step of the qualified immunity analysis, "[t]he contours of that right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  However, when a plaintiff fails to state a constitutional violation, as in this case, the Court need not examine whether the defendant's actions were reasonable.  <u>See Saucier</u>, 533 U.S. at 201 (if the facts alleged do not establish that the officer's

21

conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).  Accordingly, Defendants are entitled to the defense of qualified immunity.

Even if Plaintiff's claim survives the first prong of the qualified immunity analysis, however, he fails the second.  Under the second step, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202 (citing Wilson v. Layne, 526 U.S. 603 (1999)).  Even officers who interpret the law mistakenly but reasonably are entitled to immunity.  See Creighton, 483 U.S. at 641.  Moreover, prison officials "are entitled to wide-ranging deference" in handling disturbances among inmates.  Baldwin v. Stalder, 137 F.3d 836, 840 (5th Cir. 1998).

Defendants here did not act objectively unreasonable with respect to Plaintiff's cell assignment.  First, they do not appear to have been responsible for that assignment.  (D.E. 59, at Ex. A, at 3).  Assuming that they did have some role in the assignment, they had no reason to suspect that Brown posed a threat to Plaintiff.  Moreover, to the extent that Plaintiff challenges the cell-assignment scheme, he has not demonstrated the scheme to be objectively unreasonable as applied to himself.  The only significant and relevant factor that implicates constitutional concerns in the housing decision was the substantial difference in size between the cell-mates.  This is insufficient to show unreasonableness.  Given the absence of case law to support the proposition that a difference between cell-mates in size alone substantiates a failure to protect claim, it is not plausible to believe that "all reasonable officials similarly situated would have known" that implementing a housing process that placed larger inmates in cells alongside

22

smaller inmates was unconstitutional.  Thompson, 245 F.3d at 460.

The alleged denial of Plaintiff's earlier Offender Protection Investigation was likewise not objectively unreasonable.  His complaint was received sympathetically and he was transferred for his own safety.  (D.E. 59, at Ex. A, at 32-36).  Furthermore, there is no reason to imagine that Defendants should have been aware that their handling of the earlier complaint would affect Plaintiff's safety vis-à-vis Brown.  It would therefore not be clear to a reasonable officer that the disposition of Plaintiff's Offender Protection Investigation was unlawful under the circumstances.  Saucier, 533 U.S. at 201.  Consequently, those actions were not objectively unreasonable.

Defendants also did not act objectively unreasonable in their response to the altercation.  The attack was brief, and Plaintiff's injuries were sustained within moments of its commencement.  (D.E. 1, at 11-12).  Guards appeared promptly and quelled the violence.  Officials thus "responded reasonably to the risk" once they became aware of Plaintiff's endangerment.  Johnson, 385 F.3d at 524 (quoting Farmer, 511 U.S. at 844).  In light of the "wide-ranging deference" granted prison officials in their handling of disturbances, there was no objectively unreasonable failure to intervene.  Baldwin, 137 F.3d at 840.

In addition, Defendant Fuentes was not objectively unreasonable in allowing Plaintiff to enter his cell.  Accepting Plaintiff's allegations as true, Defendant Fuentes was either relying on a colleague to perform his job properly, or was acting out of necessity as a result of understaffing.  In either event, there was no reason that he should have been aware of a substantial risk to Plaintiff, and his decision to open the cell door cannot be portrayed as objectively unreasonable.

Finally, Defendants' actions in the aftermath of the incident do not constitute objectively unreasonable conduct.  Officials provided appropriate medical treatment for Plaintiff and conducted a thorough investigation.  (D.E. 51, at Ex. A, at 2-11, 20-21).  Ultimately, they found his story credible and transferred him for his own safety.  (D.E. 22, at 3).  These actions do not remotely resemble objectively unreasonable responses to a prison assault.

In sum, all of Defendants' challenged actions were objectively reasonable in light of the circumstances they faced.  See Saucier, 533 U.S. at 202.  Accordingly, they are entitled to the defense of qualified immunity.

**C.      Plaintiff's Remaining State Negligence Claims Are Dismissed Without Prejudice.**

Pursuant to the Prison Litigation Reform Act, inmates are required to exhaust administrative remedies for all claims raised based on federal law.  See 42 U.S.C. § 1997e(a).  Based on the explicit language concerning federal claims, state claims over which a court exercises pendent jurisdiction do not have to be exhausted pursuant to the Prison Litigation Reform Act.  See Becerra v. Symmes, No. 08-5358, 2010 WL 489513, at *2 (D. Minn. Feb. 4, 2010) (unpublished).

However, the Fifth Circuit has explained that "[g]enerally, when all federal claims have been dismissed, a district court should dismiss any pendent state law claims without prejudice so that the Plaintiff may re-file his claims in the appropriate state court."  James v. Gonzalez, 348 F. App'x 957, 959-60 (5th Cir. 2009) (per curiam) (unpublished) (citing Wong v. Stripling, 881 F.2d 200, 204 (5th Cir. 1989)).

Accordingly, the Court declines to exercise pendant jurisdiction over Plaintiff's remaining state negligence claims.

24

## VI.  CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment, (D.E. 59), is hereby granted.  Plaintiff's failure to protect claims against Richard Crites and Aaron Fuentes are dismissed.  His state common-law negligence claims are dismissed without prejudice.

ORDERED this 10th day of September 2010.


BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE